ried on the business of the store as before under the old style of Colcord, Berry & Co.

It is conceded that, up to the time of the failure, the firm complied with the requirements of the bankrupt act by keeping the proper books; but, after that time, they did not keep any cash book, nor did they enter on their journal, or any other book, the transfer of the stock to the new firm, or in any way refer thereto.

An examination of the books of the old firm nowhere discloses this transfer of the stock, or that anything was paid therefor by the new firm; the business was continued until February or March by the new firm, which made purchases of groceries from W. H. Kinsman, that, with most of the old stock, was disposed of to the men who were employed in finishing two vessels then on the stocks belonging to the old firm, but mortgaged to Kinsman. Some portion of the old stock was retailed by the new firm to other parties. When the workmen rendered in their accounts of their labor on the vessels, they were credited with the amounts on the books of the old firm, and were charged with the goods received by them in part payment from the new firm. A day book and ledger are the only account books shown to have been kept by the new firm; neither is produced, and the court is not advised as to the entries made thereon, and cannot presume that they fulfilled the requirements of the act in this behalf.

The amount of the goods turned over to the new firm by the old is stated by the bankrupt to have been about $2,000; the entire omission of any reference to this transaction on the books of the firm, and of any account with the new firm arising therefrom, in the opinion of the court, requires the refusal of the bankrupt's discharge. The books afford no information upon this subject to the assignees or creditors, either that there was a sale of the stock to the new firm, or what amount was paid therefor, or how much remained due and unpaid on this account when the firm went into bankruptcy; upon this whole proceeding, the books are silent.

Roberts testifies that when the new firm was formed, the old firm was deeply indebted to Hall, the incoming partner; that when the business of the new firm was wound up, the old firm had a settlement with the new and were still largely in debt to Hall. Of all this, so far as the court is informed, the books of the old firm make no disclosure, and there is nothing to be found therein which can in any way aid the assignees in determining for what sum the old stock was disposed of to the new firm, and how much has been paid, or to whom or what account.

This case, therefore, in this respect, is similar to that of In re Tyler [Case No. 14,305], and for this cause the court is compelled to deny the discharge.

COLCORD (WILLIAMSON v.). See Case No. 17,752.

## Case No. 2,971.

### The COLDILLERA.

[See Case No. 3,229a.]

## Case No. 2,972.

### The COLDSTREAM.

[4 Sawy. 172.] [1]

District Court, D. California. Jan. 20, 1877.

MASTER'S LIABILITY FOR DEBTS CONTRACTED BY CREW.

Where the master was arrested for certain debts contracted by his crew, which by their authority he paid: *Held*, that he was entitled to deduct the amounts so paid from their wages, but not the costs incident to the arrest.

In admiralty.

C. T. Botts and D. T. Sullivan, for libellant.

Clark Churchill, for claimant.

HOFFMAN, District Judge. The only question in this case is, whether the master paid a debt contracted by the libellant, a mariner on board the vessel, by the authority of the latter. The libellant denies that he authorized the master to pay the bill. He asserts that Wallach Brothers (the creditors) were his friends, and that they had given him a credit until his return to Sydney, on receiving from him a watch and chain as security.

The master testified in the most positive manner that Timmer authorized him to pay the bill, and in this he is corroborated by both his mates, who appear to have no interest in the controversy.

The preponderance of testimony is thus clearly in favor of the master, and this conclusion is strengthened by other circumstances which seem to have some significance.

It is not denied that the master was arrested at the suit of Wallach Brothers, for the debt due by Timmer, and for other debts contracted by the mates; that he paid those debts is also undisputed. If Timmer had, as he says, arranged for a credit with Wallach, by pledging his watch and chain, the conduct of the latter in arresting the captain and insisting upon payment was fraudulent and dishonest. It was also irrational; for how could they have expected that the demand would be complied with, when they had given a credit and retained in their possession a valuable pledge. Again, the libellant could not have been ignorant of the captain's arrest, of the nature of the demand made upon him, and of the fact of his payment. And yet he does not appear to have mentioned to any one that Wallach Brothers held his watch and chain, and that their enforcement of their demand was a breach of their

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]